WALTER E. TRITTIPO, Plaintiff-Appellee, v. DONALD V. O'BRIEN *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—88—2455

Opinion filed September 27, 1990.—Rehearing denied October 30, 1990.

Jeffrey Cole and Andrew T. Staes, both of Jeffrey Neal Cole, Ltd., of Chicago, for appellants.

Walter E. Trittipo, of Chicago, appellee *pro se.*

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

This is an appeal from the order of the trial court granting judgment for plaintiff in an action to compel the corporate defendant and the individual defendants to purchase plaintiff's shares of stock in a professional corporation following the termination of plaintiff's association with the corporation. Defendants contend on appeal that the act governing professional corporations, Professional Service Corporation Act (Ill. Rev. Stat. 1987, ch. 32, par. 415—1 *et seq.*) (the Act), does not require the redemption or purchase of the shares of a stockholder who has voluntarily withdrawn from the corporation, and that the trial court did not possess the power to grant judgment for plaintiff on the basis of equitable principles.

In 1971, plaintiff, Walter Trittipo, and one of the defendants, Donald O'Brien, formed a law partnership in which O'Brien, as senior member, held a 62½% interest and plaintiff held the remaining 37½% interest. In 1972, they incorporated the law practice, retaining the same percentage interests in the shares of the corporation as they held in the partnership. O'Brien was the corporation's president, and Trittipo served as secretary-treasurer. Between 1973 and 1975, defendants Carey and McNamara joined the firm and became shareholders in the corporation. The firm became known as O'Brien, Trittipo, Carey & McNamara, with each of the four principals owning a 25% interest in the corporation.

Differences arose among the parties, and on or about May 1, 1976, plaintiff advised O'Brien of his intention to immediately withdraw from the firm and begin his own law practice. He tendered his shares, which were then cancelled. Between May 1 and September 1976, plaintiff remained as a tenant in his office in the firm's suite.

At the time of his withdrawal from the firm, plaintiff proposed that the corporation purchase his shares with personal guarantees of the corporate obligation by the remaining shareholders. In the course of meetings following his withdrawal from the firm, the parties concurred that if an agreement could be reached on a price for plaintiff's shares, the corporation would purchase the shares. No provision had been included in the articles of incorporation, the corporate bylaws or in any separate agreement of the parties regarding the redemption or purchase of a withdrawing shareholder's stock.

Plaintiff's demand of $35,000 for his shares was rejected by the other shareholders. Plaintiff did, however, receive reimbursement for

accounts receivable from his clients prior to and following his withdrawal from the firm. Plaintiff's equity as computed by defendants was debited for amounts owed by plaintiff for office expenses and miscellaneous draws from the firm, following which defendants tendered to plaintiff a check for $234.43 as full settlement of his equity.

Plaintiff disputed the amount paid to him for his interest in the corporation. The parties continued negotiations over the next few years but were unable to agree on a valuation of the shares. On April 19, 1979, plaintiff filed a complaint in the chancery division of the circuit court pursuant to section 11 of the Act (Ill. Rev. Stat. 1977, ch. 32, par. 415—11). Plaintiff sought an accounting and specific performance in the form of an order compelling the individual defendants and the corporation to pay him the fair value of his 25% of the shares of the corporation.

Following a trial, the trial court entered judgment for plaintiff and against all the defendants, jointly and severally, in the amount of $33,028.59. The court also entered judgments of $7,512.80 and $2,073.64, respectively, against Carey and McNamara personally, amounts alleged to have been owed to plaintiff for the purchase of stock from him when they became shareholders. In announcing his decision, the trial judge remarked that the corporation was "special" in that ownership was restricted to duly licensed members of the legal profession. The court further noted that the transfer of ownership was further complicated "since no agreement or by-law provides for a buy-out at a predetermined rate." The court held that "equitable considerations require that the plaintiff be fairly compensated by the professional corporation and, by necessity, the individual defendants who succeeded or continue[d] to control it after April 30, 1976." The remainder of the court's remarks prior to entry of its order were addressed to the valuation of the shares and the amount of the judgment. Judgment was entered for plaintiff, and defendants filed a timely notice of appeal. Plaintiff cross-appeals, contending that the damages awarded by the court were inadequate and also that he should have been awarded prejudgment interest.

Opinion

The briefs and record in this case are extensive, and the parties present numerous issues and arguments. Plaintiff argues several bases upon which the trial court's judgment should be affirmed. He urges that the terms of the Act allow for a mandated redemption of his shares, and that the court's judgment, predicated on equitable principles of equitable estoppel, the trust fund doctrine, or construc-

tive trust doctrine, was appropriate. He also argues that the judgment should be affirmed on principles of contract law. In our view, however, disposition of this case is governed by interpretation of the relevant provisions in the Act.

■■ The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature (*Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 447 N.E.2d 394; *Local 143 International Union of Operating Engineers v. Board of Education* (1987), 156 Ill. App. 3d 431, 509 N.E.2d 512). In determining such intent, the statute should be read as a whole and all material parts of the legislation should be considered together. (*Castaneda v. Illinois Human Rights Comm'n* (1988), 132 Ill. 2d 304, 547 N.E.2d 43.) The statute should be interpreted on the basis of what was written, and courts should not search for any subtle or not readily apparent intention of the legislature (*Kozak*, 95 Ill. 2d 211, 447 N.E.2d 394). It is not the function of the courts to determine what the law ought to be, but to declare what it is (*Kozak*, 95 Ill. 2d 211, 447 N.E.2d 394) and to enforce it is as enacted. (*Local 143 International Union of Operating Engineers*, 156 Ill. App. 3d 431, 509 N.E.2d 512.) In addition to the language of the statute, the evils sought to be remedied and/or the objectives sought to be attained by the legislature in enacting the statute are relevant considerations. *Castaneda*, 132 Ill. 2d 304, 530 N.E.2d 1005.

Section 11 of the Act, pursuant to which plaintiff brought this action, provides in relevant part:

"No corporation organized under this Act may issue any of its capital stock to anyone other than an individual who is duly licensed or otherwise legally authorized to render the same specific professional services or related professional services as those for which the corporation was organized. ＊＊＊

The articles of incorporation shall provide for purchase or redemption of the shares of any shareholder upon his death or *disqualification*, or the same may be provided for in the by-laws of the corporation or in a separate agreement of the interested parties.

If the articles of incorporation, by-laws or separate agreement fail to state a price or method of determining a fixed price at which the corporation or its shareholders may purchase the shares of a deceased shareholder, or a shareholder *no longer qualified* to own shares in the corporation, then the price for such shares shall be the book value as of the end of the month immediately preceding the death or *disqualification*

of the shareholder. Book value shall be determined from the books and records of the corporation in accordance with the accounting methods used by the corporation." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 32, par. 415—11.

Defendants contend that the trial court erred in granting judgment for plaintiff. They assert that section 11 of the Act (Ill. Rev. Stat. 1987, ch. 32, par. 415—11) does not mandate the purchase or redemption of the shares of a shareholder who voluntarily withdraws from the corporation. They maintain that, as used in the Act, the term "disqualification" means the loss of the license required to render the professional services the corporation performs. They argue that because the statute does not mandate the redemption or purchase of the shares of a licensed shareholder who voluntarily withdraws from the corporation, the trial court lacked power to compel either the corporation or the individual defendants to purchase plaintiff's shares on the basis of "equitable considerations."

It is plaintiff's position that the term "disqualification" in the Act encompasses the voluntary termination of his employment association with the corporation and that section 11 therefore requires the defendants to purchase his shares in the corporation. He contends that the Act refers to licensed professionals as "authorized" rather than "qualified" and, therefore, the word "disqualified" has a different and broader meaning than the mere loss of license.

In support thereof, plaintiff points to section 7 of the Act, which provides:

> "No corporation organized *** under this Act may render professional services, except through its officers, employees and agents who are duly licensed or otherwise legally authorized to render such professional services within this State." (Ill. Rev. Stat. 1989, ch. 32, par. 415—7.)

Plaintiff argues that "by clear implication" this section requires that in order to "qualify" the corporation to engage in the practice of law, the licensed or otherwise legally authorized lawyers who render legal services through the corporation must either be officers, employees or agents of the corporation, rather than mere shareholders. Plaintiff reasons that a shareholder who ceases to be an officer, employee or agent of the corporation is, himself, "disqualified" to practice law through that corporation; *and,* if he practices law outside the corporation without first returning his shares, he causes the corporation to practice law in violation of the prohibition in section 7 that the corporation may not render professional services except through its officers, employees or agents. Plaintiff then concludes that the word

"disqualified" in section 11 is intended to mean one who severs his employment relationship with the corporation. We cannot agree with plaintiff's reasoning or conclusions.

■ The first paragraph of section 11 limits the issuance of stock in a professional corporation to persons who are duly licensed or otherwise legally authorized to render the specific type of services which the corporation was organized to perform. Nothing in that paragraph requires that the right to be a shareholder is dependent upon the existence of an employment relationship between the shareholder and the corporation. In the context of this case, section 11 merely requires all shareholders of the corporation to be licensed to practice law. It does not require that shareholders actually practice law through the corporation, or even that they practice law at all. Indeed, section 4 expressly provides that "[n]othing contained in this Act shall alter the right of persons licensed to engage in the rendering of a professional service from doing so in any other business form permitted them by law." (Ill. Rev. Stat. 1989, ch. 32, par. 415—4.) Since licensure or other legal authorization to render the same services the corporation performs is the only qualification stated in the Act to become a shareholder in a professional corporation, a shareholder becomes "disqualified" under the second paragraph of section 11 only when he is no longer licensed to practice the profession of the corporation.

We see no inconsistency between our reading of section 11 and section 7, which plaintiff erroneously interprets. Contrary to plaintiff's assertion, 7 does not mandate that shareholders must be officers, employees or agents of the corporation or that each shareholder practice law solely through the corporation. That section merely prohibits the rendering of professional services by officers, employees or agents of the corporation who are not licensed or legally authorized by the appropriate regulatory authority to render such services.

■ We do not agree with plaintiff that the term "legally authorized" means the same as "licensed." Section 1 states that the legislative intent of the Act is to allow individuals who are required by law to be licensed or to obtain other legal authorization to render professional services to organize a corporation through which those services are rendered. The granting of a license or other legal authorization is performed by the "regulatory authority" which is defined in section 3.2 (Ill. Rev. Stat. 1989, ch. 32, par. 415—3.2) as "the State board, department, agency or the Supreme Court of Illinois (in the cases of attorneys at law) having jurisdiction to grant a license to render the category of professional service for which a professional corporation has been organized or the United States Patent Office or the Internal

Revenue Service of the United States Treasury Department." Section 3.3 (Ill. Rev. Stat. 1989, ch. 32, par. 415—3.3) states the term "license" "includes a license, certificate of registration or any other evidence of the satisfaction of the requirements of this State, or of the United States Patent Office or the Internal Revenue Service *** for the practice of a professional service."

The Act governs all corporations rendering professional services, not all of which may require a license of the types required, for example, to practice law or medicine. From a reading of the Act as a whole, we believe the use of the disjunctive "or" in the term "or otherwise legally authorized" was used to encompass the various forms of certificates and "other evidence of satisfaction of the requirements" of the authority which regulates the practice of a given profession referred to in section 3.3.

There is no dispute that plaintiff is licensed to render the same specific professional services, *i.e.*, legal services, as the subject corporation. Therefore, under section 11, he is qualified to hold shares in that corporation. Since the shareholders did not provide in the articles of incorporation, bylaws or a separate agreement for the mandatory purchase or redemption of the shares of an employee who voluntarily terminates his employment by the corporation, there is no obligation on the part of the corporation to do so until, as the second and third paragraphs of section 11 state, his death or "disqualification" (paragraph 2) or when he is "no longer qualified" (paragraph 3) to own shares in the corporation. Ill. Rev. Stat. 1989, ch. 32, par. 415—11.

We believe that our interpretation of the Act is consistent with Supreme Court Rule 721 (107 Ill. 2d R. 721), "Professional Service Corporations and Associations for the Practice of Law." That rule provides, in pertinent part,

"(1) *each* shareholder, officer, director of the [professional] corporation (except the secretary of the corporation) *** and each of its employees engaged in the practice of law shall be licensed to practice; and

(2) one or more shareholders of the corporation *** permitted to engage in the practice of law in Illinois hereunder shall be members of the bar of Illinois, residents of the State of Illinois and engaged in the practice of law in Illinois ***; and

* * *

(4) no shareholder, officer, director of the corporation *** or any employee *** who is not a member of the bar in Illinois or is not specially admitted by court order to practice in Illinois shall be permitted to practice in Illinois." (Emphasis in origi-

nal.) 107 Ill. 2d Rules 721(a)(1), (a)(2), (a)(4).

■ Under Rule 721(a)(1), like the Act, all shareholders of an Illinois professional corporation must be licensed to practice law; but not all shareholders need be members of the Illinois bar, residents of Illinois or even actively engaged in the practice of law in Illinois or anywhere else. It is also clear from paragraph 2 in Rule 721(a), which requires that *at least one* or more shareholders be members of the Illinois bar, that not all shareholders must necessarily be licensed to practice in Illinois or that they practice only through the professional corporation in which they are shareholders. Paragraph 4, which prohibits a shareholder who is not a member of the Illinois bar from practicing in Illinois unless specially admitted by court order, is significant in that, like paragraphs 1 and 2, it makes clear that shareholders need not be actively engaged in the practice of law through the corporation in which they hold shares, but also provides an example of a situation which, under the Act, would constitute being "otherwise legally authorized."

Further, sections (c) and (f) of Rule 721 provide, respectively, that "[n]o corporation *** shall engage in the practice of law in Illinois *** without a certificate of registration issued by this court" (107 Ill. 2d R. 721(c)), and that "[a] certificate of registration *** shall certify that each shareholder or member, director and officer (except for the secretary of the corporation) is a member of the bar of each jurisdiction in which such person practices law" (107 Ill. 2d R. 721(f)).

As explained in the historical and practice notes to Rule 721:

"[P]aragraphs (a) and (f) of the rule were also amended to permit professional corporations *** formed in other states to practice law in Illinois. The former requirement that all shareholders, officers and directors of a professional service corporation *** be members of the bar of Illinois was eliminated. Instead, the rule now requires only that one or more shareholders *** be a member of the Illinois bar and engaged in the practice of law in Illinois, and that each of the shareholders, officers [and] directors *** be licensed to practice law in each jurisdiction in which they practice law. A requirement was also added that at least one person who is a practicing member of the Illinois bar be a resident of Illinois." Ill. Ann. Stat., ch. 110A, Rule 721, Historical and Practice Notes (Smith-Hurd 1985).

Defendants cite to numerous statutes in other jurisdictions, as well as the Professional Corporation Supplement to the Model Business Corporation Act (Model Professional Corporation Supplement (1984), at 1887 (1989 Supp.) (Prentice Hall)), which have construed the

term "disqualification" in statutes similar to the Illinois Act to mean the loss or suspension of a license. Although these authorities are instructive and lend additional support to defendants' position, we rely on the language of the Act itself and Supreme Court Rule 721, specifically governing professional corporations organized to render legal services, in finding that there is no statutory requirement that a shareholder be an employee of the corporation. Since the only qualification a person must possess to be a shareholder of the professional corporation under both the Act and Rule 721 is a license to render the same professional services as provided by the corporation, the term "disqualification" as used in the Act necessarily means the loss of that license, or "other legal authorization" allowing the shareholder to practice the profession of the corporation. (Accord *O'Neill v. United States* (6th Cir. 1969), 410 F.2d 888 (the section of the Ohio statute providing that "[a] professional association may issue its capital stock only to persons who are duly licensed or otherwise legally authorized to render the same professional service as that for which the association was organized" (Ohio Rev. Code Annot. par. 1785.05 (Page 1985)) held not to preclude ownership of shares by a person who is not an employee of the corporation and the statute imposes no such limitation on such transferability).) "The only limitation which it imposes is that the shareholders must be licensed to practice the profession." *O'Neill*, 410 F.2d at 898.

In interpreting a similar statute, the court in *Corlett, Killian, Hardeman, McIntosh & Levi, P.A. v. Merritt* (Fla. App. 1985), 478 So. 828, 831, stated,

"Of course, this does not mean that the articles of incorporation cannot provide or the shareholders cannot agree that shares shall be redeemed or not be sold to or retained by non-employees of the corporation. [Citation.] In fact, [quoting *O'Neill*] '[a]greements and provisions to this effect are not at all uncommon with respect to small corporations whose stock is closely held' ***. *** But, whether in the setting of a close corporation or a professional corporation, if, as here, there is no statutory requirement of redemption, the obligation and authority of a for-profit corporation to redeem its stock must be found either in its articles of incorporation [citation], or in some agreement [citation]. Absent such provision for redemption, courts will not write such an agreement for the parties [citation]."

■ In the instant case, there is nothing in the articles of incorporation, the bylaws or in a separate agreement among the parties for

the redemption or purchase of the shares of a shareholder who is neither deceased nor disqualified by reason of the loss of his or her license. There being no such provision or agreement, the trial court was not empowered to impose an obligation, on the basis of "equitable principles" to compel the corporation or its remaining individual shareholders to purchase plaintiff's shares in the corporation upon the voluntary termination of his employment with the corporation.

Plaintiff maintains that an enforceable agreement was reached shortly after his resignation from the firm for redemption of his shares in the corporation. However, plaintiff acknowledges that the parties were not able to agree on the purchase price. His complaint states, "nothing in the articles of incorporation or the by-laws or any separate agreement set forth a price or method of determining a fixed price for [his] shares." The trial court also found that there was "no agreement or by-law provid[ing] for a buy-out at a pre-determined rate."

■ Basic contract law requires that in order for an oral contract to be binding and enforceable, its terms must be definite and certain. When it appears that the language used or the terms proposed are understood differently by the parties, there is no meeting of the minds and no contract exists between the parties. (*Vandevier v. Mulay Plastics, Inc.* (1985), 135 Ill. App. 3d 787, 482 N.E.2d 377.) One of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms. Some terms may be missing or left to be agreed upon, but failure of the parties to agree upon an essential term of a contract indicates that the mutual assent required to make or modify a contract is lacking, and that there is no enforceable contract. (*Delcon Group, Inc. v. Northern Trust Corp.* (1989), 187 Ill. App. 3d 635, 543 N.E.2d 595.) The record in the instant case does not disclose that the parties reached an agreement on terms sufficient to constitute an enforceable contract.

■ Plaintiff also argues that failure to compel purchase by defendants of his interest in the corporation may create ethical and conflict of interest problems. For example, plaintiff argues that, despite his withdrawal from the firm, in his capacity as a shareholder, he would continue to have the right to attend stockholders' meetings where confidential firm and client matters are discussed, and he would have access to corporate books and records. He suggests that conflicts of interest may arise where his and the corporation's clients have adverse interests, that he may be subjected to liability in a malpractice action against the corporation, and that dividends paid out by

the corporation would constitute improper fee splitting.

The Florida Court of Appeals in *Corlett, Killian, Hardeman, McIntosh & Levi, P.A. v. Merritt* (Fla. App. 1985), 478 So. 2d 828, addressed nearly identical arguments. It was the Florida court's view that while these matters might justify action by the Florida bar, none of the potential ethical dilemmas was so compelling as to warrant a court-ordered redemption obligation on the corporation.

Plaintiff also asserts that a failure to compel redemption of his shares produces many harsh results, including the ownership by him of shares over which he will have no control, from which he would likely receive no dividends and which he could not sell, *i.e.*, "an interest that has no value." The *Corlett* court also addressed a similar argument. The court stated:

> "That a professional who resigns from the corporation could well be left in the unfortunate position of owning unmarketable shares of stock is generally true of the minority shareholders in all close corporations. But rather than being a compelling reason in favor of a court intervening, the distinct probability of this unfortunate state of affairs arising is a compelling reason why parties must agree in advance on a redemption provision. Where an employee who purchases such shares for valuable consideration either lacks the foresight or the bargaining power to insist upon a redemption agreement in the event of his resignation, it is not incumbent upon the courts to protect him from his own improvidence or lack of strength." 478 So. 2d at 834.

We, like the *Corlett* court, recognize that the failure to compel the redemption of his shares may produce harsh results and the potential for ethical problems. It is our belief, however, that these concerns do not justify unauthorized judicial intervention.

Because we reverse the order in this case on the basis of our determination that the plaintiff does not come within the category of the persons entitled to the purchase or redemption of his shares under section 11 of the Act, we need not consider the cross-appeal and other issues raised and argued by the parties.

For the reasons stated, the order of the trial court is reversed and the cause is remanded to the trial court to enter judgment for defendants.

Reversed and remanded.

JOHNSON and JIGANTI, JJ., concur.